### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 25-24 |
| | ) | Judge Nora Barry Fischer |
| LUIS FERNANDO DIAZ-GARCIA, | ) | |
| | ) | |
| Defendant. | ) | |

### <u>MEMORANDUM OPINION</u>

#### I.      INTRODUCTION

In this case, Defendant Luis Fernando Diaz-Garcia is charged with one count of illegal reentry by a removed alien, in violation of 8 U.S.C. § 1326. (Docket No. 1). After a detention hearing was held on February 19, 2025, U.S. Magistrate Judge Maureen P. Kelly ordered that he be released on a $50,000 unsecured appearance bond and subject to conditions of release including home detention and electronic monitoring at a residence located in the Eastern District of Virginia. (Docket Nos. 15; 16). Presently before the Court is the Government's Motion to Revoke the Order of Pretrial Release, (Docket No. 23), its Brief in Support, (Docket No. 26), Defendant's Brief in Opposition, (Docket No. 29), and the Government's Reply, (Docket No. 30). This Court has conducted a *de novo* review of the release order and the record below which includes the transcripts of the initial appearance and detention hearings, the testimony of ICE Deportation Officer Alex Simon, the exhibits presented by the parties, the Pretrial Bond Report, and information provided by Pretrial Services Officer Kacie Simpson. (Docket Nos. 25; 26-1; 26-7; 29-1). The parties have also supplemented the record with email communications from Pretrial Services and a Pennsylvania State Police Report, ("PSP Report"), the latter of which was not available at the time of the detention hearing. (Docket Nos. 26 at 6-7; 26-5; 29-1). After careful consideration of the

1

parties' arguments in light of the evidence of record, and for the following reasons, the Government's Motion [23] will be granted, the release order will be reversed and vacated and Defendant will be detained pending trial.

II.    BACKGROUND

At the initial appearance in this matter on February 11, 2025, U.S. Magistrate Judge Christopher B. Brown denied Defendant's motion for immediate release on bond and scheduled a detention hearing in this case.  (Docket No. 26-1).  Magistrate Judge Brown found that the Government proffered sufficient facts to show that Defendant was a serious risk of flight, including that he: is a native of Honduras; had previously been removed from the U.S. and returned; has no ties to this District; possibly has family ties in Virginia; and has two criminal cases pending where he faces penalties.  (*Id*. at 14).  Defendant was temporarily detained pending a detention hearing. (Docket Nos. 11; 12).  Defendant did not appeal Magistrate Judge Brown's decision to the District Court and, as noted above, the case proceeded to a detention hearing before Magistrate Judge Kelly on February 19, 2025.

The record developed during the detention hearing establishes the following.  Defendant is currently 26 years old and is a native of Honduras.  *Pretrial Bond Report* at 1.  His mother remains in Honduras and his father is deceased.  (*Id*.).  He has a limited educational background as he has neither obtained a high school degree nor a GED.  (*Id*.).  On November 1, 2019, Defendant entered this country illegally by crossing the Rio Grande near Roma, Texas and was swiftly deported back to Honduras via an air transport leaving Brownsville, Texas on November 13, 2019.  (Docket No. 26-3).  At the time, he told immigration authorities that he: came to this country to work; expected to be in the United States for about 1-year; had never lived in the United States before nor tried to enter the United States illegally; and did not fear returning to Honduras.  (*Id*.).

Defendant was processed before he was deported at which time he was photographed and fingerprinted.  (Docket No. 26-3).  He was also provided with a Notice to Alien Ordered Removed/Departure Verification dated November 13, 2019[1] which states:

> You have been found to be inadmissible to the United States under the provisions of section 212(a) of the Immigration and Nationality Act (Act) or deportable under the provisions of section 237 of the Act […]  In accordance with the provisions of section 212(a)(9) of the Act, you are prohibited from entering, attempting to enter, or being in the United States
>
> X  For a period of 5 years from the date of your departure from the United States as a consequence of your having been found inadmissible as an arriving alien in proceedings under section 235(b)(1) or 240 of the Act.
> …
>
> After your removal has been effected, you must request and obtain permission from the Secretary of Homeland Security to reapply for admission to the United States during the period indicated.  You must obtain such permission before commencing your travel to the United States.  Application forms for requesting permission to reapply for admission may be obtained by contacting any United States Consulate or U.S. Department of Homeland Security office.
> …
>
> WARNING FOR ALL REMOVED ALIENS:  It is a crime under Title 8, United States Code, Section 1326, for an alien who has been removed from the United States to enter, attempt to enter, or be found in the United States without the Secretary of Homeland Security's express consent.  Depending on the circumstances of the removal, conviction for this crime can result in imprisonment of a period from 2 to 20 years and/or a fine up to $250,000.

(Docket No. 26-3 at 1).

At the detention hearing, Defendant did not present any evidence concerning his activities between the time that he was deported in 2019 and when he returned to the United States.  (*See*

---

[1]    The report indicates that Defendant was interviewed in Spanish by Border Patrol Agent Johnny Smith. (Docket No. 26-3).  Agent Smith also signed the Notice to Alien Ordered Removed/Departure Verification as the "officer serving warning" to Defendant. (*Id.*).

Docket No. 25). Indeed, the record does not state definitively when he reentered the United States, but it appears that he has been in this country since at least 2021. *See Pretrial Bond Report* at 1. To that end, Defendant reported to Pretrial Services that he started working as an independent roofer on February 14, 2021 and made $4,000 a month in this role. (*Id*.). Defense counsel proffered that Defendant filed tax returns but presented no evidence to support these assertions. (Docket No. 25 at 62). As to Defendant's living arrangements, he explained that he lived in Virginia for two years before moving to Pennsylvania, where he resided for the next two years. *See Pretrial Bond Report* at 2. Prior to his arrest and detention, he was living in an apartment in New Castle, Pennsylvania with two roommates (whom he declined to identify) that also worked with him. (*Id*.). Before that, he had been living in Virginia with Evis Garcia (a/k/a Jose Evis Garcia Hernandez), and Pretrial Services was told that this individual was his uncle and a U.S. citizen. (*Id*.). Officer Simon testified that he could not confirm that they were related. (Docket No. 25 at 26). He also clarified that Evis Garcia was a lawful permanent resident and that he had no criminal history. (*Id*. at 40).

Evis Garcia wrote a letter in support of Defendant which was translated from Spanish and also spoke to the Pretrial Services Officer during a break from the hearing with the assistance of the translator. (Docket Nos. 26-6; 25 at 6-7, 69-71). From this information, it was revealed that Evis Garcia was also in the roofing business and was the employer for Defendant and his roommates. (*Id*.). It was later explained that Evis Garcia had residences in both New Castle (where Defendant was living with the roommates) and Virginia, where he lived with his wife and two children (and where Defendant had previously lived). (*Id*.). The apartment in New Castle was rented and Evis Garcia spends time there when he is doing roofing work in warm months, but he owns his primary residence in Virginia, where he spends the cold months. (Docket No. 26 at 6).

No further information was provided about Evis Garcia's wife or children, including their ages, criminal histories, or immigration statuses. (Docket Nos. 26-6; 25 at 6-7, 69-71). Defendant also reportedly has a 7-year-old child who lives with his mother Stephanie O'Choa in Virginia. *See Pretrial Bond Report* at 1-3. The record does not indicate in what part of Virginia they live, their immigration statuses, or Ms. O'Choa's criminal history. (*Id*.; Docket No. 25). It is uncontested that Pretrial Services did not visit either residence.

The Pretrial Bond Report stated that Defendant had been arrested and charged with misdemeanor DUI/Unsafe Driving and summary offenses including drivers required to be licensed and three counts of restrictions on alcoholic beverages arising out an August 19, 2024 incident. *See Pretrial Bond Report* at 3-4. At the time of the detention hearing, the criminal complaint of that incident was not available, and the parties were unclear as to the nature and circumstances of the allegations. (Docket No. 25 at 60). Upon questioning from the Magistrate Judge about the drunk driving offense, the attorneys were unaware of his blood alcohol level, but defense counsel suggested that the DUI offense was likely a lowest tier drunk driving offense based on his review of the docket. (*Id*.).

Defendant was fingerprinted at the time of his DUI arrest and ICE was alerted that the fingerprints matched those taken at the time he was processed for his initial unlawful entry into this country. (Docket No. 25 at 9, 16-17, 20). It is uncontested that Defendant voluntarily appeared for a proceeding related to the DUI and other charges at the local magistrate judge's office in Cheswick, Pennsylvania, on January 27, 2025, at which time he was arrested by ICE agents. (*Id*. at 10). He has been detained by ICE since that time and ICE has lodged a detainer against him. (*Id*. at 23). Officer Simon explained that ICE had determined that Defendant's classifications as: high risk of flight; medium risk to public safety; and, low custody. (Docket Nos. 25 at 41-42; 26-

7).  The agent clarified that the medium risk to public safety designation was likely the result of the fact that the state charges are pending and unresolved.  (*Id*. at 46-7).  Officer Simon testified that if Defendant was released on bond by this Court, he would be returned to ICE custody and would then either make bond on his immigration case or be deported from the country.  (Docket No. 25 at 34).  The parties agreed that Defendant could be brought to court on a writ for his proceedings while he was in ICE custody.  (*Id*. at 79-80).

Defendant was in possession of a passport from Honduras at the time of his arrest.  (Docket No. 25 at 10-11). The passport was issued to him in 2023 and does not have any stamps or other marks on it which the officer understood to mean that Defendant had not traveled internationally on that passport.  (*Id*.).  Defendant was not in possession of any other identification documents at the time of his arrest.  (*Id*. at 78).  ICE has seized and maintained custody of the Honduran passport.  (*Id*. at 11).  Defendant refused to be interviewed by ICE and/or to sign forms when he was detained in 2025.  (Docket No. 26-4).  At the beginning of the detention hearing, the officer testified that Defendant would have an opportunity to make an asylum claim and that a hearing had not yet been held.  (Docket No. 25 at 27-28).  Defense counsel suggested that his client wanted to make an asylum claim and that he wanted to remain in the United States and work here.  (*Id*. at 61-62, 64).  After the break, the United States proffered that the officer had obtained additional information and that Defendant had already had an asylum interview on February 5, 2025, a "no fear" finding had been made regarding his return to Honduras, and that Defendant stated that he did not want to have his claim reviewed by an administrative law judge.  (Docket No. 25 at 72-73).

At the conclusion of the evidentiary presentations, Pretrial Services repeated its recommendation that Defendant be detained pending trial.  (Docket No. 25 at 75).  The Magistrate Judge heard argument from counsel and then ordered that Defendant be released on bond, with

conditions including home detention and electronic monitoring and that he live at Evis Garcia's residence in Virginia.  (Docket Nos. 15; 16).  The Magistrate Judge made the following findings in support of that decision:

> The next factor I am required to consider is the nature and circumstances of the offense charged and whether the offense is a crime of violence or involves narcotics. This is a straightforward alien reentry case. It does not involve narcotics or a charge of violence.  Therefore, that factor weighs in favor of release.

> The next factor I am required to consider is the weight of the evidence against the accused as it relates to the underlying offense. Based on the testimony of Officer Simon before me, it appears that there was an illegal reentry. At least the evidence supports that. So that factor weighs against you.

> The next factors that I am required to consider are your history and characteristics. Physical and mental condition. Physical condition is good. Mental health condition is good. And no history of any substance abuse or anything like that. So those factors weigh in favor of release.

> Family ties, although your mother is [in] Honduras, your uncle, your 7-year-old son, and the mother of your child are all in Virginia. That factor weighs in your favor, that you do have family ties within the country and within this part of the United States.

> Employment, financial resources. The report from pretrial services is that you've worked for four years, making over $4,000 a month. You've been gainfully employed. There is no evidence of drug dealing or anything illegal to generate income. So that lawful employment, including that you filed tax returns, that factor weighs in your favor.

> Length of residence in the community, community ties. It appears that you have lived in the New Castle area and been back and forth to Virginia for the last four years, although I do note Attorney Silinski's argument as to the date that the Honduran passport was issued. So it may have been a trip home. I'm not sure there. I don't have evidence on that.

> No history of drug or alcohol abuse, so that factor is in your favor. No prior criminal history. That factor is in your favor. Record concerning court appearances, no failure to appear. You have no

prior criminal record aside from the illegal reentry in 2019; and when you incurred the DUI charge, you appeared as directed at the local magisterial district justice. So there is no record of any failures to appear. So those factors weigh in your favor.

The next factor I am required to consider is whether, at the time of the current offense, you were on probation or parole. And you were not, so that factor weighs in your favor.

The next factor I am required to consider is the nature and seriousness of danger to any person or the community if you are released. Consistent with what pretrial services found, I do not find that there is any serious danger to any person or the community, although I am concerned that you drank alcohol and drove.

But in terms of the criteria set forth in the Bail Reform Act, I do not find, based on the evidence, testimony, and argument, as well as the finding of pretrial services, that this is a case of danger to the community. There is no alleged criminal conduct in terms of charges, guns, drugs, illegal dealing, anything like that.

Additional factors that I consider in terms of viewing the entire situation before the Court, I note that, as defense counsel argued, this defendant has a low custody classification. There is no adverse supervision history.

There are no risk factors. He has not been identified as part of any special threat group. There are no open warrants. There are no disciplinary infractions while in custody. As I indicated, there's no criminal history or history of violent crimes. In terms of failure to appear, he appeared in court as directed on the DUI charge. There is no history of absconding. There is no history of the use of any false identification. When he was stopped, he promptly presented his Honduran passport, and his passport is valid. There is no fake identification or anything along those lines.

In terms of the RCA, which Attorney Silinski addressed on redirect, again, it is a low custody situation. I questioned the agent about risk to the public. I appreciate the information that was provided, but I've already addressed that factor. So the real issue boils down to risk of flight.

I also look at Defendant's Exhibit B, which on Pages 106 and 107 provides further information in terms of the lack of risk associated with Mr. Diaz-Garcia, including many of the factors that I have talked about, including no history of absconding, no

substance abuse history. He was in possession of a valid government ID, did not possess any fraudulent documents, and has lived at his address for definitely more than six months.

So it boils down to the issue for the Court as to whether or not it has been established that he is a serious flight risk. Based on the evidence, testimony, and argument presented, any immigration case could be considered a flight risk. The fact that there is an ICE detainer does not establish that a person is a serious risk of flight, and Attorney Silinski recognized that and acknowledged that in her argument.

So the issue becomes: Are there conditions or a combination of conditions that I could impose? Given the absence of any evidence that this defendant has engaged in flight, I find that there are conditions or a combination of conditions that I can impose. So the conditions that I am going to impose is that he is to reside with his uncle in Virginia.

I will place him on home detention with electronic monitoring in Virginia. Obviously, it will be up to pretrial services to determine what type of monitoring they want to use and whether they want to use GPS, but that will be for the district court in Virginia.

The reality is the order that I am entering as to release just means that Mr. Diaz-Garcia goes from marshals custody into immigration custody, and things will proceed from there.

If there is a need for him to be brought back to this district, that can be dealt with by a writ. So even though I am entering my order, it's there, but obviously the issues with ICE will need to be dealt with first. So we're going to need to do an order with conditions of release. We'll do that in a moment.

(Docket No. 25 at 75-79).

In support of its motion to revoke the release order, the Government attached a police report from the Pennsylvania State Police ("PSP Report") which includes a criminal complaint, supporting affidavits, docket sheet and other information regarding the state charges. (Docket No. 26-5). Although the PSP Report was not provided to the Magistrate Judge, Defendant has not objected to its consideration by this Court. (*See* Docket No. 29). The PSP Report provided

additional information about Defendant's offense conduct, his behavior during his arrest and the background of his roommates who were with him at the time. (Docket No. 26-5).

As to the alleged offense, Defendant was traveling westbound on the Turnpike in a construction zone on August 19, 2024 after 9:00 p.m. in a White Ford Van with a roof rack and an Ohio license plate and registration. (Docket No. 26-5 at 11-14). He was pulled over for driving erratically, swerving between lanes, and nearly sideswiping a marked PSP vehicle which had pulled into the adjoining lane to investigate. (*Id*.). Although this is a 3-lane section of the highway, the far-right lane was closed for overnight construction work. (*Id*.). The PSP Report indicates that Defendant was not wearing a seatbelt and was driving without a license with several open 16-ounce cans of Miller Lite. (*Id*.). The vehicle had no insurance and bald tires which were worn and could not pass an inspection. (*Id*.). The responding trooper reported that Defendant's eyes were bloodshot, he emitted the smell of alcohol, his speech was slurred, he was slow to react and either unable or unwilling to follow instructions. (*Id*.). The troopers determined that he had consumed five of the 16-ounce Miller Lite beers. (*Id*.).

One of the troopers attempted to give Defendant a breathalyzer exam but he provided multiple invalid breath samples. (Docket No. 25 at 11-14). He was then transported to the hospital where he refused a blood test. (*Id*.). Given same, his blood alcohol content was never retrieved but he faces up to 6 months' imprisonment under Pennsylvania law given his refusals. (Docket No. 26 at 15 (citing 75 Pa.C.S. §3802(a)(1), (b)(2)). The vehicle was towed and Defendant was released to Evis Garcia. (Docket No. 26-5 at 13-14). Defendant was charged a few weeks later with DUI, "driving without a license, failing to drive on the right half of the roadway, failing to drive within a single lane and or movement from lane was not made safely, careless driving, reckless driving, possessing an open alcoholic beverage on a highway, improper tires, and failure

to wear a seatbelt." (Docket No. 26 at 16 (citing Docket No. 26-5, Gov. Ex. D)). Due to his arrest by ICE, Defendant has yet to appear in state court on the charges and the preliminary hearing and arraignment have been continued to March 31, 2025. (Docket No. 26-5 at 32).

The PSP Report contains some additional information about Defendant and his roommates, including that:

- Defendant was born in Honduras but apparently told troopers that his citizenship was "American" at the time of his arrest, (Docket No. 26-5 at 3);

- Defendant worked for GDF Construction, located in Warrenton, VA, (Docket No. 26-5 at 3);

- Defendant had a cell phone number with a 346-area code, (Docket No. 26-5 at 3);

- Defendant had passengers in the vehicle. They identified themselves, and provided the same address as Defendant in New Castle, PA, (Docket No. 26-5 at 5-6); and,

- They told troopers they were returning from Virginia after completing a roofing job together, (Docket No. 26-5 at 12).

(Gov. Ex. D).

Upon receiving the PSP Report, the Government's ongoing investigation has revealed that:

- Defendant's prepaid cell phone is associated with Dish wireless and out of Houston, Texas, (Docket No. 26 at 16);

- Defendant's roommates and coworkers were both from Honduras and have no legal status in the United States, (Docket Nos. 26-5 at 12-13; 26 at 16-17);

- Roommate 1 "is presently an ICE fugitive, stemming from a May 31, 2023 encounter with CBP" and also "has pending charges against him, in Kentucky, from a September 30, 2024 incident involving reckless driving" (Docket No. 26 at 17); and,

- Roommate 2 "was encountered by CBP on April 14, 2018, in Laredo, Texas, and was determined unlawfully present in the United States" and a previously issued removal order had expired but "will

be re-issued for his apprehension and deportation" (Docket No. 26
at 17).

Defendant does not contest the accuracy of this information but complains that ICE agents were

dispatched to the New Castle apartment to arrest or deport these individuals for being

undocumented, although he is no longer requesting that he be released to that location. (Docket

No. 29 at 16).

The Government's Motion has been fully briefed as the Court has also reviewed the

Government's brief, Defendant's response, and the Government's reply. (Docket Nos. 23; 26; 29;

30). No further briefing has been requested and the Motion is now ripe for disposition.

### III.    LEGAL STANDARDS

A District Judge reviews the decision of the U.S. Magistrate Judge granting or denying bail

*de novo.  United States v. Delker*, 757 F.2d 1390, 1394 (3d Cir. 1985). The Court retains the

discretion to make its determination after reviewing the record developed before the U.S.

Magistrate Judge or to accept additional evidence from the parties and rule on the expanded record.

*See e.g.,* 18 U.S.C. § 3142(f)(2)(B); *United States v. Burgess*, Crim. No. 09-150, 2009 WL

2038148, at *2 (W.D. Pa. Jul. 9, 2009). Here, neither party has requested a further hearing and the

Court does not believe that a hearing is necessary. Accordingly, the Court will decide the appeal

on the basis of the existing record, as supplemented by the parties.

### IV.    DISCUSSION

The U.S. Court of Appeals for the Third Circuit has held that:

> Congress passed the [Bail Reform Act ("BRA")] to address whether
> and under what circumstances a district court may release a
> defendant pending trial. *See United States v. Salerno*, 481 U.S. 739,
> 742-43, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). It was enacted to
> ensure "all persons, regardless of their financial status, shall not
> needlessly be detained ... pending appeal, when detention serves
> neither the ends of justice nor the public interest." *United States v.*

> *Provenzano*, 605 F.2d 85, 87 n.13 (3d Cir. 1979) (quoting Bail
> Reform Act of 1966, Pub. L. No. 89-465 § 2, 80 Stat. 214, 214
> (1966)). The BRA […] requires the pretrial release of defendants
> unless 'no condition or combination of conditions will reasonably
> assure the appearance of the person as required and the safety of any
> other person and the community.' 18 U.S.C. § 3142(e)(1)).

*United States v. Soriano Nunez*, 928 F.3d 240, 244 (3d Cir. 2019). Relevant here, the BRA states

that a detention hearing shall be held upon a motion by the Government in a case that involves "a

serious risk that [the defendant] will flee." 18 U.S.C. § 3142(f)(2). It is the Government's burden

to demonstrate by a preponderance of the evidence that Defendant is a flight risk. *See United*

*States v. Himler*, 797 F.2d 156, 161 (3d Cir. 1986). In reaching a decision on release or detention,

the Court conducts an individualized assessment and weighs the evidence in light of the factors set

forth in 18 U.S.C. § 3142(g), i.e.:

> (1) the nature and circumstances of the offense charged […];
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including--
>
> > (A) the person's character, physical and mental condition,
> > family ties, employment, financial resources, length of residence
> > in the community, community ties, past conduct, history relating
> > to drug or alcohol abuse, criminal history, and record concerning
> > appearance at court proceedings; and
> >
> > (B) whether, at the time of the current offense or arrest, the
> > person was on probation, on parole, or on other release pending
> > trial, sentencing, appeal, or completion of sentence for an
> > offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the
> community that would be posed by the person's release.

18 U.S.C. § 3142(g).

As a general matter, "individuals on release arising from other offenses and non-citizens

are treated the same as other pretrial criminal defendants under the BRA." *Soriano Nunez*, 928

F.3d at 244-45. "Thus, the presence of an ICE detainer and the threat of potential removal alone are not sufficient to deny BRA pretrial release." *Id*. at 245, n.4 (citing *United States v. Ailon-Ailon*, 875 F.3d 1334, 1338-39 (10th Cir. 2017)). Similarly, the facts that an individual is subject to an ICE detainer and may not be released if he is transferred to ICE custody are insufficient reasons to grant him pretrial release under the BRA. *Cf. id.* Rather, the Court is tasked with weighing the evidence and conducting an individualized assessment of the § 3142(g) factors to determine if release on bond or detention is appropriate. *See* 18 U.S.C. §§ 3142(g)(1)-(4).

The Court has now done so in this case and the totality of the facts and circumstances demonstrate that the Government has proven by a preponderance of the evidence that Defendant's release on bond under any conditions would present a serious risk that he will flee and not appear at criminal proceedings in this case. *See Himler*, 797 F.2d at 161. The Court considers each of the above listed factors, in turn.

First, the nature and circumstances of the illegal reentry charge include that in 2019 Defendant left his native Honduras, traveled to Mexico, crossed the Rio Grande and illegally entered this country near Roma, Texas, without any type of documents authorizing his admission to the United States. (Docket No. 26-2). He was apprehended the next day, did not contest an expedited deportation, was removed from the country via an air transport less than two weeks later, ordered to stay out of the United States for a period of 5 years, and advised of the potential penalties (including jail time) for illegally reentering again. (*Id*.). Despite same, Defendant admits that he returned to the United States within that 5-year exclusion period, has been here since at least 2021, and has lived in Virginia and/or New Castle, Pennsylvania. *See Pretrial Bond Report* at 1-2. While he obtained a Honduran passport that was issued in 2023, it has not yet been used for international

travel and he did not have any additional legitimate or fake travel documents in his possession. (Docket No. 25 at 10-11).

It appears to the Court that such facts demonstrate by a preponderance of the evidence that Defendant is a risk to flee the jurisdiction to avoid prosecution and deportation. *See Himler*, 797 F.2d at 161. He has an incentive to flee as the prior expedited deportation took less than two weeks, but he now faces up to two years in prison for allegedly engaging in the same behavior. *See* 8 U.S.C. § 1326. The record supports a finding that he could flee the country by self-deporting as he has engaged in international travel without documentation in the past, and there is little stopping him from doing so again if he is released on bond. (Docket No. 26-2). There is also a risk that he will travel outside of the jurisdiction but within the United States as the record shows that he was resourceful enough to move throughout the United States and live in different areas of the country without authorization for the past 4 years. *See Pretrial Bond Report* at 1-3.

Second, while Defendant is presumed innocent of the illegal reentry offense, it appears that the weight of the evidence against him is strong. *See* 18 U.S.C. § 3142(g)(2). To that end, Defendant was photographed and fingerprinted at the time of his initial deportation and ICE has determined from such biometric data that he is the same individual who has been charged in this case. (Docket Nos. 26-2; 25 at 9, 16-17, 20). Defendant has not objected to the Magistrate Judge's finding that this factor weighs against his release, and he has not previewed any defense to the charge at this point. (*See* Docket No. 29). Therefore, the Court finds that this factor favors detention as well.

Third, the evidence of Defendant's history and characteristics likewise establishes by a preponderance that there is a risk that he will flee and not appear for court. *See* 18 U.S.C. § 3142(g)(3). Indeed, the PSP Report and additional information proffered by the Government in

its brief make clear to this Court that the Magistrate Judge did not have the full picture at the time that the release order was issued. (*Compare* Docket No. 25 *with* Docket No. 26). The Court also believes that such information significantly undermines the credibility of the release plan as it shows that the unsworn information that Defendant and his supporter provided is incomplete and contains numerous inconsistencies. Defense counsel also made several unsupported proffers which the Court cannot accept.

In Defendant's favor, it is uncontested that he has no prior criminal convictions, no significant physical or mental health issues, and no record of violating conditions of release or failing to appear for court. *See* 18 U.S.C. § 3142(g)(3)(A). With that said, those factors are outweighed by the other evidence (including his lack of community and family ties, past conduct, and involvement in the DUI episode indicating an alcohol problem) demonstrating that he is a flight risk. *See Himler*, 797 F.2d at 161. Defendant's only supporter, Evis Garcia, did not appear at the hearing, was not sworn to testify, and has presented little verifiable information. (*See* Docket No. 25). While they both told Pretrial Services that Evis Garcia was his uncle, Officer Simon could not confirm that they are actually related. (*See Pretrial Bond Report* at 1-2; Docket No. 25 at 26). Defendant had not mentioned an uncle upon questioning by immigration authorities and no corroborating evidence was presented resolving this issue. (*Id.*).

Defense counsel maintains that Defendant always used his real name, presented his Honduran passport as identification, and "engaged in no deception" during his interactions with authorities. (Docket No. 29 at 24). Yet, the PSP Report notes that Defendant's place of birth was "Honduras," and erroneously states that his citizenship was "American" – leaving the Court to question whether he lied and told the trooper that he was a citizen. (Docket No. 26-5 at 3). Evis Garcia gave inconsistent information about his own citizenship too as he apparently told the

pretrial services officer that he was a U.S. citizen while Officer Simon stated that he was a lawful permanent resident with a green card. (*See Pretrial Bond Report* at 2; Docket No. 25 at 26). In separate interviews, Defendant and Evis Garcia declined to provide the identities of the roommates/coworkers and the Government has discovered that both are undocumented Honduran nationals who have no legal authorization to be in this country and are facing deportation and/or charges in other jurisdictions. (Docket No. 26 at 16-17).

While the Court will accept that Defendant was working as a roofer, this Court has held in cases involving U.S. citizens that work performed "under the table" is not legitimate and therefore cannot conclude that Defendant was engaged in lawful employment because he is a non-citizen who lacks a visa authorizing him to work in this country. *See e.g., United States v. Hammond*, Cr. No. 16-121, 2016 WL 7384175, at *3 (W.D. Pa. Dec. 21, 2016) ("Because the Pretrial Services/Probation Office is unable to verify such employment, the Court concludes that Defendant lacks verifiable legitimate employment."). There are also varying accounts of the employment relationship in the record. For example, Defendant told the state trooper that he was employed by GDF Construction but informed the pretrial services officer that he was an independent roofer and did not provide any information about his employer. (Docket No. 26-5 at 3; *Pretrial Bond Report* at 1-2). When called by pretrial services, Evis Garcia explained that he was the employer for Defendant and his roommates/coworkers and the Government later confirmed that GDF Construction is owned by Evis Garcia. (Docket No. 26 at 17-18). There are differing statements as to the housing situation as well with Defendant telling pretrial services that he and the two roommates were renters and Evis Garcia explaining that he rented the apartment in New Castle and lives there during warm months when he is on construction jobs in the area. (*See* Pretrial Bond Report at 2-3; Docket No. 26 at 6-7).

Of course, it is a violation of the immigration laws of this country to knowingly employ unauthorized aliens and/or to harbor or assist them by providing them with residences and anyone doing so is potentially subject to civil and criminal penalties. *See e.g.*, 8 U.S.C. § 1324a(f)(1) ("Any person or entity which engages in a pattern or practice of violations of subsection (a)(1)(A) or (a)(2) shall be fined not more than $3,000 for each unauthorized alien with respect to whom such a violation occurs, imprisoned for not more than six months for the entire pattern or practice, or both"); § 1324(a)(1)(ii) (any person who "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation" or "encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law" is subject to a period of imprisonment of up to 5 years). Setting aside any violations of immigration laws due to the prior employment and housing of Defendant and/or his roommates, it should now be clear that the New Castle apartment is not an appropriate residence for Defendant and Evis Garcia cannot continue to employ him in any capacity. In fact, it would be against the law for Defendant to work anywhere while released on bond and he would have to be financially supported by others. *See id*.

Moving on, the Court also questions other aspects of the proposed release plan to live in Evis Garcia's Virginia residence because, even if he was an appropriate third-party custodian – which he is not—he reportedly only lives there during the cold months and no information was provided concerning the citizenship and criminal histories of his wife, 16-year-old son, and 22-year-old son such that the Court cannot fully evaluate the propriety of this residence. *See e.g., United States v. Atkins*, Crim. No. 15-87, 2015 WL 4920831, at *6 (W.D. Pa. Aug. 18, 2015)

(rejecting release plan as pretrial services had never visited residence and the proposed third party custodian's work and childcare schedule made her unavailable to serve in that role for large portions of time and "the mere fact that a relative or other individual is willing to serve as a third party custodian for a defendant is not sufficient to justify release on such conditions"). The Court simply cannot infer from this record that these individuals are citizens and would not approve any defendant's release plan without more information about the individuals who live in the residence to which release is sought. *See id.* Similarly, the record lacks any details about Defendant's 7-year-old child or the child's mother, aside from the facts that they live in an unspecified area of Virginia and Defendant provides the child with financial support. In any event, Warrenton, Virginia is well outside of this Court's jurisdiction and Defendant has not lived there for more than 2 years, making his release to that area inappropriate. *Cf. United States v. Ewell*, No. CRIM. 13-125, 2013 WL 4479029, at *3 (W.D. Pa. Aug. 20, 2013) (rejecting release plan, in part, because "Defendant also proposes that he live outside this Court's jurisdiction in North Carolina, making his appearances in this District for court proceedings somewhat more difficult than an individual who is released within the District."). All told, the evidence of Defendant's community and family ties is weak and does not support his release on bond. *See* 18 U.S.C. § 3142(g)(3)(A).

Next, Defendant's character and past conduct do not support his release given his alleged behavior resulting in the state charges. *See id*. In this regard, defense counsel argued to the Magistrate Judge that his client had allegedly engaged in a lowest tier drunk driving offense and continues to downplay the significance of this conduct. (Docket Nos. 25 at 60; 29 at 21-22). But the allegations include that Defendant was driving drunk in a construction zone on the turnpike, with open containers of beer, and was not wearing a seatbelt. (Docket No. 26-5 at 11-14). He did not have a driver's license or liability insurance. (*Id*.). Although the vehicle was registered in

Ohio, it had bald tires which could not pass inspection. (*Id*.). He was driving recklessly and swerving erratically to the point that he almost side-swiped a marked police vehicle, endangering his own life as well as those of his two passengers and the trooper. (*Id*.). He was not cooperative with the state trooper, did not complete the breathalyzer test, was continually removing his seatbelt during the transport to the hospital, and refused a blood test once he arrived there. (*Id*.). The circumstances of this incident certainly lead the Court to question whether Defendant can be trusted to follow any conditions of release and make it more likely than not that he is unable to abide by such conditions. *See Himler*, 797 F.2d at 161.

In addition, the evidence from the DUI arrest shows that Defendant has a history of traveling within the United States as he and his roofing coworkers were driving from Virginia to Pennsylvania, two states which do not share a border, he previously lived in both states, the vehicle he was driving was registered in Ohio, and the cell phone he was using was associated with Houston, Texas. (Docket No. 26-5 at 3, 11-14). He appears to have sufficient financial means to flee as he reportedly made more than $4,000 per month as a roofer and had $502 in cash on his person when he was arrested by ICE agents in January. *See Pretrial Bond Report* at 1; Docket No. 25 at 26. Defendant also faces up to 6 months' imprisonment for the DUI offense which provides him additional incentive to flee.

This Court sees additional problems with the credibility of the release plan as defense counsel made proffers during the hearing before the Magistrate Judge which are plainly unsupported by any evidence including that Defendant had filed tax returns for his employment as a roofer and would be making an asylum claim to legalize his immigration status. (Docket No. 25 at 61-64). In its brief, the Government points out that Defendant could not have legally paid taxes and Defendant has not mentioned taxes at all in his response. (Docket Nos. 26 at 18-19; 29).

Regardless, there is no evidence substantiating the claim that Defendant filed tax returns or paid taxes on his income. The supposed asylum claim was corrected before the Magistrate Judge made the ruling with the Government proffering after the break that Officer Simon was able to confirm that the asylum interview had taken place two weeks before the detention hearing, a "no fear" determination had been made, and Defendant declined to have it reviewed by an ALJ. (Docket No. 25 at 72-73). The record simply lacks evidence of a pathway for Defendant to legally remain in this country and, for the reasons already stated, the prospect that he will likely be deported again provides him with an added incentive to flee.

Fourth, as to the nature and seriousness of the danger to any person or the community that would be posed by the person's release under § 3142(g)(4), there is no evidence that Defendant has ties to a gang, engaged in violence, sold drugs, possessed firearms, or would pose a risk of harm to any specific person. (*See* Docket Nos. 25; 26; 29; 30). With that said, Defendant allegedly engaged in drunk driving last August and such behavior presents significant dangers to himself and other members of the community. *See e.g., Begay v. United States*, 553 U.S. 137, 141, 128 S. Ct. 1581, 1584, 170 L. Ed. 2d 490 (2008), *abrogated by Johnson v. United States*, 576 U.S. 591, 135 S. Ct. 2551, 192 L. Ed. 2d 569 (2015) ("Drunk driving is an extremely dangerous crime."). There is also some risk that Defendant will commit other crimes given that he reportedly came to this country to work and has been providing financial support to his child through the money he earned as a roofer, although he is not legally authorized to work to meet those obligations. *See e.g., United States v. Provenzano*, 605 F.2d 85, 95 (3d Cir. 1979) ("a defendant's propensity to commit crime generally, even if the resulting harm would be not solely physical, may constitute sufficient risk of danger to come within the contemplation of the [Bail Reform] Act."). Hence, there is some risk of danger to the community if Defendant is released, slightly favoring detention.

For all of these reasons and after carefully weighing all of the facts of record, the Court must conclude that the Government has sufficiently established by a preponderance of the evidence that releasing Defendant on bond with any conditions presents a serious risk that he will flee and/or not appear for Court. *See Himler*, 797 F.2d at 161.

V.    CONCLUSION

Based on the foregoing, the Government's Motion [23] is GRANTED, the Magistrate Judge's Order of Pretrial Release is REVERSED, and Defendant is ordered detained pending trial. An appropriate Order follows.

<u>*s/Nora Barry Fischer*</u>
Nora Barry Fischer
Senior U.S. District Judge

Dated:        March 14, 2025

cm/ecf:       All counsel of record